UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
:
ROBERTO FLORES,                                             No. 06 Civ. 0986 (JSR)(MHD)
:
Plaintiff,
:
-against-
:

THE PINNACLE GROUP, KEW GARDENS NY,          :
LLC, JOEL WIENER AND HARRY HIRSCH,
:
Defendants.
:

:
------------------------------------------------------------------- x

# DEFENDANT'S STATEMENT IN COMPLIANCE WITH RULE 56.1[1]

1.  The Pinnacle Group ("Pinnacle") is a company that manages residential multi-family properties throughout New York City. Generally, Pinnacle also has an ownership interest in the buildings it manages. (Wiener Aff. ¶ 1).

2.  Pinnacle is owned and managed by Joel Wiener ("Mr. Wiener"), who receives managerial assistance from Mr. Harry Hirsch ("Mr. Hirsch), the Director of Field Operations. (Wiener Aff. ¶ 1-2).

3.  Pinnacle's services include overseeing the operations, maintenance and expenditures at certain properties. (Wiener Aff. ¶ 1).

4.  Pinnacle also oversees the day-to-day supervision of building service employees (the "Service Employees") at the buildings it manages. (Hirsch Dep. 5-6; Wiener Aff. ¶ 1).

---

[1] Defendant also submits herewith: (1) Defendant's Memorandum of Law in Support of its Motion for Summary Judgment; (2) the Affidavit of Joel Wiener, sworn to August 9, 2006 ("Wiener Aff.") and exhibits attached thereto; and (3) the Affidavit of Joel E. Cohen, Esq., sworn to August 14, 2006 ("Cohen Aff.") and the exhibits attached thereto.

5. On or about June 8, 2004, Pinnacle purchased a complex of 1269 rental apartments consisting of 3 story buildings over 27 acres in Queens, New York (the "Kew Garden Apartments") from Two Trees, the former owner and operator. (Wiener Aff. ¶ 4; Wiener Dep. 20; Flores Dep. 10-11).

6. Prior to taking over the properties, Mr. Wiener visited the premises in order to evaluate the conditions of the buildings and to assess the performance of the Service Employees who were employed by Two Trees, including, but not limited to, superintendents, porters and handy men. These Service Employees were represented by Service Employees International Union Local 32BJ, AFL-CIO ("Local 32BJ" or "Union") for the purposes of collective bargaining. (Flores Dep. 10).

7. As a matter of practice, whenever Pinnacle purchases a building, Mr. Wiener prefers to hire the current service employees because they are already familiar with the operations of the building. (Wiener Aff. ¶ 5).

8. Upon inspection of the Kew Garden Apartments and assessment of the Service Employees, Mr. Wiener decided to hire twenty (20) of the twenty-four (25) Service Employees that had previously been employed by Two Trees. Three of the Service Employees who were not hired were Caucasian. (Wiener Dep. 39-40; Rojas Dep. 8; Hirsch Dep. 25).

9. Under the ownership and management of Pinnacle, these Service Employees continued to be represented by Local 32BJ and were covered by a collective bargaining agreement ("CBA") that governs the terms and conditions of employment for the Service Employees employed at the Kew Garden Apartments. (Flores Dep. 10; Wiener Aff. ¶ 5).

10. Plaintiff was one of the porters whom Mr. Wiener hired from Two Trees. (Flores Dep. 10-11; Wiener Dep. 39; Wiener Aff. ¶ 7). Like the other Service Employees, Plaintiff was

covered by a union contract through Local 32BJ and he received union benefits. (Flores Dep. 11; Wiener Aff. ¶ 7).

11. Plaintiff worked along with a superintendent ("super") and handy man, Conrad Pinnock ("Mr. Pinnock"), and two other employees, Victor Rojas, a porter ("Mr. Rojas") and another employee Orlando Disla ("Mr. Disla"). (Flores Dep. 23-24, 26; Fried Dep. 35; Pinnock Dep. 5-7; Rojas Dep. 6; Disla Dep. 5-6). Mr. Disla is not a member of management and has no supervisory authority. (Wiener Aff. ¶ 8).

12. Plaintiff's shift began at 8:00 a.m. and ended at 5:00 p.m., during which time Plaintiff reported to the property managers Myer Fried ("Mr. Fried") and Joseph DiGenova ("Mr. DiGenova") for day-to-day supervision. (Flores Dep. 24; Fried Dep. 16, 27, 35-36; Pinnock Dep. 7, 15).

13. Neither Mr. Fried nor Mr. DiGenova made any decisions with respect to hiring and termination of Service Employees. (Fried Dep. 27, 33).

14. Mr. Wiener has the sole authority to hire and fire employees. (Fried Dep. 42-43; Wiener Aff. ¶ 6, Ex. 1).

15. At the time that Plaintiff was hired by Pinnacle, he was 42 years old and within the protected age class. (Flores Dep. 11-12).

16. At the Kew Garden Apartments, each Service Employee is required to clock in by punching a timecard at the beginning and at the end of each shift. (Flores Dep. 24-25, Fried Dep. 37).

17. No one monitors the clock to ensure that employees punch in; however the supervisors, Mr. Fried and Mr. DiGenova would check the work areas in order to verify that the employees were working when they were supposed to. (Fried Dep. 37-38).

18. On the morning of December 30, 2004, one of the property managers, Mr. Fried, was looking for Plaintiff, but Plaintiff was nowhere to be found.

19. Mr. Fried asked other employees whether they knew of Plaintiff's whereabouts, but no one had seen him and no one had knowledge of where he was. (Fried Dep. 46-47).

20. Several hours after Plaintiff was supposed to begin working, Plaintiff arrived at work and was observed by Mr. Fried. (Flores Dep. 25, 27).

21. Plaintiff admitted that he arrived several hours late for work that morning. (Flores Dep. 25-26). Plaintiff also admitted that he did not notify any member of management that he would be late for work that day. (Flores Dep. 26-27).

22. Upon Plaintiff's arrival, Mr. Fried confronted Plaintiff about failing to show up to work on time for his 8:00 a.m. shift. (Flores Dep. 28, 29; Fried Dep. 44-45). Plaintiff admitted to Mr. Fried that he was hours late to work. (Flores Dep. 30; Fried Dep. 49).

23. Earlier, when Mr. Fried had been looking for Plaintiff, Mr. Fried had checked Plaintiff's time card and found that it had been punched at 7:45 a.m. (Fried Dep. 52-53; Wiener Dep. 20-21).

24. Accordingly, Mr. Fried asked Plaintiff to explain how his timecard was punched for the start of Plaintiff's shift, when Plaintiff did not arrive until hours later. (Fried Dep. 44-45). Plaintiff had no explanation. (Fried Dep. 45; Flores Dep. 29-30).

25. Mr. Flores admitted that he did not punch his timecard that day. (Flores Dep. 27-28).

26. Mr. Fried concluded that Plaintiff had instructed another employee to clock him in early so that it would appear that Plaintiff was at work, even though he was not.[2] (Fried Dep. 43, 48).

27. Mr. Fried then informed Mr. Wiener about Plaintiff's late arrival and told him about the fact that Plaintiff's timecard had nevertheless been punched at 7:45 a.m. (Fried Dep. 34, 45, 48; Weiner 20-21; Wiener Aff. ¶ 8-9, Ex. 3).

28. By letter dated January 5, 2005, Mr. Wiener advised Plaintiff that he was suspended pending further investigation because he instructed another employee to "punch-in" his timecard, stating that Plaintiff's behavior was "unacceptable" and emphasizing that it would "not be tolerated by the Employer." (Wiener Aff. ¶ 10, Ex. 4; Wiener Dep. 24-25; Fried Dep. 50).

29. Thereafter, Mr. Wiener made the decision to terminate Plaintiff. (Wiener Dep. 20, 78-79; Fried Dep. 43; Hirsch Dep. 26).

30. Plaintiff filed a grievance with the Union after Pinnacle suspended him. (Flores Dep. 31; Wiener Aff. ¶ 12).

31. Ultimately the Union was satisfied that Pinnacle rightfully terminated Mr. Flores because he was responsible for stealing time and it decided not to pursue arbitration. (Flores Dep. 31-32; Weiner Dep. 56-59).

32. Mr. Wiener made the decision to both hire and fire Plaintiff. (Wiener Dep. 20, 78-79; Fried Dep. 42-43; Hirsch Dep. 25-26; Wiener Aff. ¶ 7, 11).

33. Plaintiff was hired in June of 2004 and the incident resulting in his termination occurred on December 30, 2004, *less than one year later*. (Flores Dep. 11-12, 25).

---

[2] No one knows for certain who punched in the card. (Fried Dep. 53; Rojas Dep. 6-7; Wiener Dep. 51). Mr. Wiener was aware that there was suspicion that it could have been Victor Rojas, but could not prove it. (Wiener Dep. 51, 53).

34. Mr. Wiener --*who is 57 years old* -- was within the protected age class when he made the decisions to both hire and fire Plaintiff. (Wiener Aff. ¶ 14).

35. No one was hired to directly replace Plaintiff. (Wiener Dep. 79).

36. Most of Plaintiff's duties were absorbed by Victor Rojas, another Hispanic worker who is older than Plaintiff and in the same protected classes. (Flores Dep. 19-20; Rojas Dep. 9-10; Wiener Aff. ¶ 11).

37. Plaintiff admitted that no one ever made any comments to him relating to age, race or any other protected characteristic. (Flores Dep. 12, 34-35).

38. Pinnacle believed that Plaintiff had attempted to steal unearned wages from the company by having someone punch his timecard. (Wiener Aff. ¶ 9; Fried Dep. 43).

39. Pinnacle reached its conclusion that Plaintiff was stealing time based on its investigation of the incident and because it found it hard to believe that someone would falsify Plaintiff's time entries (which benefited only Plaintiff) without Plaintiff's direction, involvement or knowledge. (Wiener Aff. ¶ 9).

40. The EEOC issued a finding of "no probable cause" to believe there was any discrimination involved in Plaintiff's termination. (Wiener Aff. ¶ 12-13, Ex. 7; Wiener Dep. 59).

41. Mr. Flores admitted that he was well treated until his termination and that he bases his entire case on the fact that he was fired "unfairly." (Flores Dep. 13, 35).

42. Kew Gardens has a diverse workforce as evidenced by the fact that 52% of Kew Garden employees are minority individuals, 48% of employees are Hispanic and 67% are over age 40. (See Wiener Aff ¶ 14, Ex. 8).

43. Approximately 49% of employees who have been hired to work at the Kew Garden Apartments are Hispanic and approximately 73% of employees who have been hired are over 40 years of age. (Wiener Aff. ¶ 14, Ex. 8).

44. Plaintiff admitted that he was represented by a union (Local 32BJ) and covered by a CBA. (Flores Dep. 9-11).

45. Holiday pay is governed by the provisions of the CBA that covered Plaintiff's employment and, accordingly, any dispute over the application of this provision should have been grieved through the Union. (Wiener Aff. ¶ 7, Ex. 2).

46. Plaintiff admitted that he did not grieve his claim for holiday pay he was allegedly owed through the union. (Flores Dep. 33-34).

47. The CBA that covers Plaintiff's employment contains provisions governing discharge or lay off. (Wiener Aff. ¶ 7, Ex. 2).

48. Mr. Flores was employed by Pinnacle from June 2004 until January 2005 -- <u>more than</u> 90 days after it purchased the property. (Flores Dep. 11-12; Wiener Dep. 72-73; Wiener Aff. ¶ 10, Exs. 4, 5).

Dated: New York, New York
       August 14, 2006

          Respectfully submitted,

          McDERMOTT WILL & EMERY LLP

          By: _____
               Joel E. Cohen (JEC 5312)
               Shanna B. Green (SG 0617)

          340 Madison Avenue
          New York, New York 10017
          (212) 547-5400

          Attorneys for Defendants